## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

| | |
|---|---|
| SARAH HAPKA, individually, and on behalf of all others similarly situated, | ) ) ) |
| Plaintiff, | ) Case No. ) |
| v. | ) **CLASS ACTION COMPLAINT** ) |
| CARECENTRIX, INC., | ) **DEMAND FOR JURY TRIAL** ) |
| Defendant. | ) ) ) |

## CLASS ACTION COMPLAINT

Plaintiff Sarah Hapka ("Plaintiff"), on behalf of herself and all others similarly situated alleges upon personal knowledge as to herself and her own actions, and upon information and belief, including the investigation of counsel, as follows:

## NATURE OF ACTION

1.      Defendant CareCentrix, Inc. a/k/a CareCentrix ("CareCentrix") provides home healthcare services and maintains offices in various states around the country, including Kansas.

2.      In a form letter dated March 21, 2016 to Plaintiff Hapka and her fellow employees, CareCentrix admitted that its current and former employees' 2015 Internal Revenue Service ("IRS") Wage and Tax Statements ("W-2 Forms") were compromised by an unauthorized individual.  According to CareCentrix's admission, an unauthorized individual impersonated a CareCentrix employee through email and obtained the W-2 Forms from CareCentrix (the "Data Breach").  The W-2 Forms included, among other sensitive information, employees' full names, addresses and ZIP codes, dates of birth, wages, and Social Security Numbers.

3.      The exact number of people affected is, as yet, unknown, but reports indicate that the potentially-affected pool of individuals could be as high as 2,000.  Even worse, the IRS has already informed Plaintiff Hapka that she has been the victim of tax fraud.

4.      Plaintiff Hapka is a former employee at CareCentrix whose personal and tax information was compromised in the Data Breach. Plaintiff received notice from CareCentrix of the Data Breach in a letter from CareCentrix dated March 21, 2016.  On April 18, 2016, Plaintiff received a letter from the IRS indicating that a fraudulent tax return had been filed in her name using her correct wage information.

5.      The Data Breach occurred because CareCentrix failed to implement adequate and reasonable cyber-security procedures.  Further, in light of a 2014 data breach at CareCentrix and the fact that healthcare companies are among the most frequently targeted by scammers, CareCentrix knew it was a target yet failed to exercise reasonable care and implement adequate cyber-security training, including secure file-transfer protocols for all employees and adequate training on how to spot "spoofing" e-mails from unauthorized senders.   Plaintiff brings this class action lawsuit on behalf of herself and all other persons whose personal and tax information was compromised in the Data Breach.   Plaintiff and the Class are seeking damages arising from CareCentrix's failure to implement and maintain reasonable and effective security practices.

## PARTIES

**Plaintiff**

6.      Plaintiff Sarah Hapka is domiciled in Johnson County, Kansas. Since the Data Breach became public in March 2016, Plaintiff has been notified by CareCentrix that her personal and tax information has been compromised.  Similarly, the IRS has notified Plaintiff that she has been the victim of tax fraud.  Due to the timing of the Data Breach and that the

fraudulent tax return contained Plaintiff Hapka's correct wage information, Plaintiff suffered tax fraud as a direct and proximate result of the Data Breach.

**Defendant**

7.      Defendant CareCentrix, Inc. a/k/a CareCentrix is a Delaware corporation with its principal place of business at 20 Church St., Ste. 1100 in Hartford, Connecticut. CareCentrix maintains an office at 6130 Sprint Parkway, Ste. 200 in Overland Park, Kansas where it employed Plaintiff.

## JURISDICTION AND VENUE

8.      This Court has jurisdiction pursuant to 28 U.S.C. § 1332(d)(2) ("The Class Action Fairness Act") because minimal diversity of citizenship exists between parties in this action, the aggregate amount in controversy exceeds $5,000,000, and there are 100 or more members of the Class.

9.      Venue is proper in this district pursuant to 28 U.S.C. § 1391 because a substantial part of the events giving rise to Plaintiff's claims occurred in this District, CareCentrix regularly conducts business in this District and maintains an office in this District.

## FACTUAL ALLEGATIONS

### The Data Breach

10.      On February 24, 2016, a CareCentrix employee received an e-mail requesting CareCentrix employees' W-2 Forms.  The e-mail request was designed to appear to come from a CareCentrix employee, but in reality came from an unauthorized third party using a similar e-mail address.  This is a common data security breach tactic known as "spoofing."

11.     The CareCentrix employee complied with the unauthorized user's request and sent CareCentrix employees' W-2 Forms, including Plaintiff Hapka's W-2 Form, to the unauthorized user.

12.     CareCentrix claims it did not discover the Data Breach until March 7, 2016.

13.     On or about March 21, 2016, CareCentrix sent a letter to affected individuals notifying them of the Data Breach.  The letter stated, in part, that:

> We are writing to share with you important information about a security incident that involved your personal information, as well as steps we are taking in response, and the resources we are making available to you.
>
> **What Happened?**
>
> On March 7, 2016, we discovered that as the apparent result of a fake email from an individual impersonating a CareCentrix employee, a copy of your IRS Form W-2 was emailed to an unknown unauthorized individual on February 24, 2016. We immediately initiated an investigation and contacted federal law enforcement, the IRS, and arranged for 24 months of credit monitoring at no charge to you.
>
> **What Information Was Involved?**
>
> Your IRS Form W-2 is a Wage and Tax Statement that includes your name, address, and Social Security number along with income and withholding information.
>
> **What We Are Doing**
>
> We are fully cooperating with law enforcement in their investigation. We have also notified the IRS and asked them to flag affected Social Security numbers in order to help detect and deter filing of fake tax returns in order to claim fraudulent tax refunds.
>
> Notices like this one are being sent to all individuals whose information was affected, and we have included here information about steps you can take to protect yourself.

### The Widespread Prevalence of Spoofing Scams

14.     E-mail spoofing is the forgery of an e-mail header so that the message appears to have originated from someone or somewhere other than the actual source. For example, spoofed

e-mail may purport to be from someone in a position of authority, asking for sensitive data such as passwords, credit card numbers, or other employee information that can be used for a variety of criminal purposes.

15.     As noted by cyber-security blogger Brian Krebs, this type of fraud "usually begins with the thieves either phishing an executive and gaining access to that individual's inbox, or e-mailing employees from a look-alike domain name that is one or two letters off from the target company's true domain name. For example, if the target company's domain was "example.com" the thieves might register "examp1e.com" (substituting the letter "L" for the numeral 1) or "example.co," [instead of example.com] and send messages from that domain."[1]

16.     Spoofing fraud has been on a steady incline in recent years. The Federal Bureau of Investigation (FBI) recently issued an alert stating that from October 2013 through February 2016, law enforcement received reports from over 17,000 victims of "spoofing" scams which resulted in more than $2.3 billion in losses. Since January 2015, the FBI has seen a 270% increase in identified victims and exposed loss from spoofing scams.[2]

17.     There are two primary defenses to "spoofing" scams: employee education and technical security barriers. Employee education is the process of adequately making employees aware of common spoofing scams and implementing company-wide policies requiring the request or transfer of sensitive personal or financial information only through secure sources to known recipients. A tell-tale sign of a spoofing e-mail is an "urgent" request from a company "executive" requesting that confidential information be provided via e-mail or other means.

---

[1] Brian Krebs, *FBI: $2.3 Billion Lost to CEO Email Scams*, KREBS ON SECURITY (April 7, 2016), http://krebsonsecurity.com/2016/04/fbi-2-3-billion-lost-to-ceo-email-scams/ (last visited May 31, 2015).

[2] *FBI Warns of Dramatic Increase in Business E-Mail Scams* (April 4, 2016), https://www.fbi.gov/phoenix/press-releases/2016/fbi-warns-of-dramatic-increase-in-business-e-mail-scams (last visited May 31, 2016).

Oftentimes the request comes from a suspicious or unfamiliar e-mail address and may include incorrect spelling or an unusual tone. Employee education and secure file-transfer protocols provide the easiest method to assist employees in properly identifying fraudulent e-mails and prevent unauthorized access of personal and tax information.

18.     From a technical perspective, companies can also greatly reduce the flow of spoofing e-mails by implementing certain security measures governing e-mail transmissions, including Sender Policy Framework (SPF), DomainKeys Identified Mail (DKIM), and Domain-based Message Authentication, Reporting and Conformance (DMARC).

19.     For example, SPF is a simple e-mail validation system that allows domain owners to publish a list of IP addresses or subnets that are authorized to send e-mail on their behalf to reduce the amount of spam and fraud by making it much harder for malicious senders to disguise their identities.

20.     DKIM is an e-mail authentication method designed to help Internet service providers (ISPs) prevent malicious e-mail senders by validating e-mail from specific domains. Scammers oftentimes send e-mail to unwitting recipients by purporting to be from a trusted brand or sender. By "signing" e-mail with DKIM, legitimate senders can label which domains they belong to and empower ISPs to block e-mail streams that have not been properly authenticated. DKIM thus allows the receiver to check that an e-mail claimed to come from a specific domain was indeed authorized by the owner of that domain, and prevents someone from intercepting e-mail, altering it, then sending it along with new (and possibly fraudulent) information.

21.     DMARC builds on SPF and DKIM by instructing the mail server how to handle e-mails that fail SPF and DKIM validation tests. DMARC also introduces the concept of

"domain alignment" which means that authentication has to be from the same domain (or a sub-domain) as the return e-mail address. It is thus intended to combat certain techniques often used in phishing and e-mail spam, such as e-mails with forged sender addresses that appear to originate from legitimate organizations.

## CareCentrix's Cyber-Security Failures Despite Warnings

22.     Despite the widespread prevalence of "spoofing" and other scams aimed at obtaining confidential information from American employers, healthcare companies in particular, CareCentrix provided its employees with unreasonably deficient cyber-security training or information transfer protocols upon hiring or at any time prior to the Data Breach.

23.     CareCentrix failed to adequately train its employees on even the most basic of cyber-security protocols, including:

> (a) How to detect "phishing" and "spoofing" e-mails and other scams including providing employees common examples and guidance on how to verify if e-mails are legitimate;

> (b) Effective password management including guidelines on password requirements, how to store passwords, how to share passwords, and how often to update passwords;

> (c) Avoidance of clicking on e-mailed or online links that are suspicious or from unknown sources;

> (d) Implementing document retention and destruction guidelines for maintaining and destroying sensitive data;

> (e) Locking and limiting access to computers and mobile devices containing sensitive information; and

(f) Protecting sensitive employee information including personal and financial information by implementing requirements/guidelines on how to request the transfer of such information (for example, only in-person requests) and how to securely send such information through a secure file transfer system to known recipients.

24.     CareCentrix's failure to adequately provide this basic training is especially egregious because CareCentrix has experienced cyber-security failures prior to the Data Breach. In 2014, a former CareCentrix employee stole patient health information, including patients' first and last names, addresses, dates of birth, Social Security Numbers, health plan numbers, and types of home care equipment, services and supplies.[3]

25.     In addition, healthcare is one of the most frequently targeted industries by scammers. In 2015 alone, over 253 healthcare data breaches occurred effecting approximately 112 million people.[4] A 2016 Data Breach Industry Forecast issued by Experian reiterated what has been common knowledge in the healthcare industry for many years:

> [H]ealthcare companies will remain one of the most targeted sectors by attackers, driven by the high value compromised data can command on the black market along with the continued digitization and sharing of medical records. In 2016, sophisticated attackers will continue to focus on insurers and large hospital networks where they have the opportunity for the largest payoff. With the move to electronic health records (EHRs) continuing to gain momentum and becoming more widely accessible through mobile applications, the attack surface continues to grow.

***

---

[3]   CareCentrix 2014 Data Breach Notification Letter dated September 18, 2014, http://doj.nh.gov/consumer/security-breaches/documents/carecentrix-20140918.pdf (last visited May 31, 2016).

[4] U.S. Department of Health and Human Services, Office for Civil Rights, Breach Portal: Notice to the Secretary of HHS Breach of Unsecured Protected Health Information, https://ocrportal.hhs.gov/ocr/breach/breach_report.jsf (last visited May 31, 2016).

**The Takeaway**:

The healthcare sector will continue to be a focal point for attacks in the coming year because of the value of medical records on the black market. While credit card records continue to lose value on the dark web, medical records remain lucrative. **It's important that health organizations not only continue to invest in up-to-date security technologies, but also focus on training employees on proper data handling practices on a regular basis**.[5]

26.     As the self-styled "leader in managing patient care to the home,"[6] CareCentrix knew or should have known that it would be a target for scammers as a company in the healthcare industry.  Indeed, as a company in the healthcare field that had previously suffered cyber-security failures, CareCentrix knew it was a target and should have implemented adequate employee training and information transfer protocols as well as Information Technology protocols to prevent this precise type of Data Breach.

27.     CareCentrix was aware, or should have been aware, that it was a target for scammers yet failed to implement adequate cyber-security measures because of, upon information and belief, the costs involved in employee training and upgrading its Information Technology protocols. As a result, CareCentrix failed to adequately implement either of the two primary defenses to "spoofing" scams—adequate employee education or technical security barriers, including necessary security measures governing e-mail transmission such as SPF, DKIM, and/or DMARC.

**<u>Plaintiff Hapka's W-2 Form was Compromised</u>**

28.     Plaintiff Hapka was employed by CareCentrix from January 4, 2010 through January 8, 2016 as a project coordinator and administrative assistant.

---

[5]Experian     Third     Annual     2016     Data     Breach     Industry     Forecast, http://www.experian.com/assets/data-breach/white-papers/2016-experian-data-breach-industry-forecast.pdf (last visited May 31, 2016) (emphasis added).

[6] http://www.carecentrix.com/About-Us (last visited May 31, 2016).

29.     CareCentrix maintained Plaintiff's personal and tax information including Plaintiff's name, address and ZIP code, date of birth, wages, and Social Security Number. Plaintiff relied on CareCentrix to keep this information confidential and securely maintained.

30.     On or about March 21, 2016, Plaintiff received a letter from CareCentrix informing her that her W-2 Form information had been compromised as part of the Data Breach.

31.     On April 18, 2016, Plaintiff mailed in her correct 2015 tax return to the IRS.

32.     Later on April 18, 2016, Plaintiff received a letter from the IRS informing her that a 2015 tax return had previously been filed in Plaintiff's name.  When Plaintiff received the April 18, 2016 letter from the IRS, she knew she was a victim of tax fraud because that previously filed tax return was filed without Plaintiff's knowledge or consent.

33.     The April 18, 2016 letter from the IRS contained a transcript of the fraudulently filed tax return.  The fraudulently filed tax return contained Plaintiff's correct wage and withholding information but included incorrect and greatly exaggerated itemized deductions. The fraudulent tax return resulted in a significant and incorrect tax return paid to the perpetrator of the fraud.

34.     CareCentrix's negligence associated with the Data Breach directly and proximately caused Plaintiff to be a victim of tax fraud.

35.     Plaintiff has spent and will continue to spend a significant amount of time, effort and expense countering the repercussions of the tax fraud and Data Breach.  To date, Plaintiff has spent multiple hours on telephone conferences with IRS representatives regarding the status of her correct 2015 tax return.  In addition, Plaintiff has completed and mailed additional IRS forms in order to simply file her correct 2015 tax return.  Further, Plaintiff has expended out of pocket costs related to postage and mileage in countering the tax fraud.  Moreover, Plaintiff will

continue to experience delays associated with the filing of her correct 2015 tax return.  Finally, as detailed *infra*, Plaintiff will continue to be at heightened risk for tax fraud and identify theft and their attendant dangers for years into the future.

### Effect of the Data Breach on CareCentrix's Employees

36.     The ramifications of CareCentrix's failure to protect the sensitive personal and tax information of its employees are severe. Identity thieves can use the W-2 Form information stolen in the Data Breach to perpetrate a wide variety of crimes, including tax fraud. Access to W-2 information permits identity thieves to quickly and easily file fraudulent tax returns using the victim's information to obtain a fraudulent refund. The IRS will direct-deposit the refund to the bank account or prepaid debit card (which are virtually untraceable) provided by the fraudster.

37.     According to the IRS, tax-refund fraud is expected to account for $21 billion in 2016, up from $6.5 billion two years ago. One of the primary reasons for this rapid growth is that it only takes a name, date of birth and Social Security number to file a fraudulent return, and the fraud is typically not detected until after the fraudulent refund has been disbursed and the criminals have long disappeared.

38.     The stolen W-2 information also permits identity thieves to commit other types of fraud including signing up for fraudulent credit cards and loan accounts, as well as various types of government fraud such as changing immigration status using the victim's name, obtaining a driver's license or identification card in the victim's name but with another's picture, using the victim's information to obtain government benefits, obtaining a job, procuring housing, or even giving false information to police during an arrest. In the medical context, stolen W-2 information can be used to submit false insurance claims, obtain prescription drugs or medical

devices for black-market resale, or get medical treatment in the victim's name.

39.      The U.S. Social Security Administration (SSA) warns that "[i]dentity theft is one of the fastest growing crimes in America."[7] "Identity thieves can use [the victim's] number and your good credit to apply for more credit in [the victim's] name. Then, they use the credit cards and do not pay the bills. [The victim] may not find out that someone is using your number until [the victim is] turned down for credit or [] begin[s] to get calls from unknown creditors demanding payment for items [the victim] never bought."[8] In short, "[s]omeone illegally using your Social Security number and assuming your identity can cause a lot of problems."[9]

40.      Under SSA policy, individuals cannot obtain a new Social Security Number until there is evidence of ongoing problems due to misuse of the Social Security Number. Even then, the SSA recognizes that "a new number probably will not solve all your problems. This is because other governmental agencies (such as the IRS and state motor vehicle agencies) and private businesses (such as banks and credit reporting companies) will have records under your old number. Along with other personal information, credit reporting companies use the number to identify your credit record. So using a new number will not guarantee you a fresh start."[10]

41.      In fact, a new Social Security Number is substantially less effective where "other personal information, such as [the victim's] name and address, remains the same" and for some victims, "a new number actually creates new problems. If the old credit information is not associated with [the victim's] new number, the absence of any credit history under your new

---

[7] *Identity Theft And Your Social Security Number, Social Security Administration* (Dec. 2013), http://www.ssa.gov/pubs/EN-05-10064.pdf (last visited May 31, 2016).

[8] *Id.*

[9] *Id.*

[10] *Id.*

number may make it more difficult for [the victim] to get credit."[11]

42.     As a result, Plaintiff Hapka and members of the Class now face a real and immediate risk of identity theft, tax fraud, and other problems associated with the disclosure of their Social Security Number, and will need to monitor their credit and tax filings for an indefinite duration.

43.     The processes of discovering and dealing with the repercussions of identity theft are time consuming and difficult. The Bureau of Justice Statistics found that "among victims who had personal information used for fraudulent purposes, 29% spent a month or more resolving problems."[12]

44.     Additionally, there is commonly lag time between when harm occurs and when it is discovered, and also between when personal information is stolen and when it is used. According to the U.S. Government Accountability Office, which conducted a study regarding data breaches:

> [L]aw enforcement officials told us that in some cases, stolen data may be held for up to a year or more before being used to commit identity theft. Further, once stolen data have been sold or posted on the Web, fraudulent use of that information may continue for years. As a result, studies that attempt to measure the harm resulting from data breaches cannot necessarily rule out all future harm.[13]

45.     There is a very strong probability that those impacted by the Data Breach could be at risk of fraud and identity theft for extended periods of time. Plaintiff has already suffered tax

---

[11] *Id.*

[12] Erika Harrell and Lynn Langton, *Victims of Identity Theft*, *2012*, (Bureau of Justice Statistics Dec. 2013), http://www.bjs.gov/content/pub/pdf/vit12.pdf (last visited May 31, 2016).

[13] U.S. Government Accountability Office, GAO Report to Congressional Requesters, *Data Breaches Are Frequent, but Evidence of Resulting Identity Theft Is Limited; However, the Full Extent Is Unknown* (June 2007), http://www.gao.gov/new.items/d07737.pdf (last visited May 31, 2016).

fraud for the 2015 tax season and she and members of the Class are likely to be prime targets for tax fraud in future years.

46.     Following the Data Breach, CareCentrix offered affected individuals two free years of credit monitoring services from AllClearID.  Although credit monitoring can help detect fraud after it has already occurred, it has very little value as a preventive measure and does nothing to prevent fraudulent tax filings. As noted by Krebs, "although [credit monitoring] services may alert you when someone opens or attempts to open a new line of credit in your name, most will do little — if anything — to block that activity. My take: If you're being offered free monitoring, it probably can't hurt to sign up, but you shouldn't expect the service to stop identity thieves from ruining your credit."[14]

47.     As a result of CareCentrix's negligent cyber-security practices, Plaintiff Hapka and the Class have been exposed to fraud and a heightened and imminent risk of fraud and identity theft. Plaintiff and the Class must now and in the future closely monitor their financial accounts to guard against identity theft and tax fraud. Plaintiff and the Class may be faced with fraudulent debt, or incur costs for, among other things, paying monthly or annual fees for identity theft and credit monitoring services, obtaining credit reports, credit freezes, and other protective measures to deter, detect, and mitigate the risk of identity theft and fraud.

48.     The injuries suffered by members of the Class as a direct and proximate result of the Data Breach include, but are not limited, to:

        a.   Theft of their valuable personal and tax information;

---

[14] Brian Krebs, *Are Credit Monitoring Services Worth It?*, KREBS ON SECURITY, (March 19, 2014),  http://krebsonsecurity.com/2014/03/are-credit-monitoring-services-worth-it/  (last  visited May 31, 2016).

b.  Loss or delay of tax refunds as a result of fraudulently filed tax returns, including but not limited to the deprivation of the time value of their money due to delay in receiving refunds and the requirement that in the future they file paper returns or use special PIN codes, thus ensuring that future tax refunds will also be delayed;

c.  Costs associated with the detection and prevention of identity theft and unauthorized use of their personal information and financial, business, banking, and other accounts;

d.  Costs associated with time spent and the loss of productivity from taking time to address and attempt to ameliorate, mitigate, and deal with the actual and future consequences of the Data Breach, including working with the IRS to correct fraudulent tax filings, finding fraudulent charges, cancelling credit cards, purchasing credit monitoring and identity theft protection services, placing fraud alerts on their accounts, the imposition of withdrawal and purchase limits on compromised accounts, and the stress, nuisance, and annoyance of dealing with all issues resulting from the Data Breach;

e.  The imminent and certain impending injury flowing from fraud and identify theft posed by their personal information being placed in the hands of hackers;

f.  Damages to and diminution in value of their personal information entrusted to CareCentrix for purpose of maintaining employment; and

g.  Continued risk to affected individuals' personal information, which remains in the possession of CareCentrix and which is subject to further breaches so long

as CareCentrix fails to undertake appropriate and adequate measures to protect

the personal information that affected individuals entrusted to CareCentrix.

## CLASS ACTION ALLEGATIONS

49.     Plaintiff brings this action on behalf of herself and as a class action under Federal

Rules of Civil Procedure 23(a), (b)(1), (b)(2) and/or (b)(3), seeking damages and equitable relief

on behalf of the following class:

> All persons whose personal and tax information was compromised as a result of
> the Data Breach announced by CareCentrix in March 2016 (the "Class").

50.     Excluded from the Class are: CareCentrix, including any entity in which

CareCentrix has a controlling interest, is a parent or subsidiary, or which is controlled by

CareCentrix, as well as its officers, directors, and legal representatives.  Also excluded are the

judges and court personnel in this case and any members of their immediate families.

51.     **Numerosity**. The Class is so numerous that joinder of all members is

impracticable. Although Plaintiff Hapka does not know the exact number of the members of the

Class, Plaintiff believes there are potentially 2,000 members of the Class.

52.     **Commonality**. Common questions of law and fact exist as to all members of the

Class. Such questions of law and fact common to the Class includes, but are not limited to:

    a.  Whether CareCentrix engaged in the wrongful conduct alleged herein;

    b.  Whether CareCentrix owed a duty to Plaintiff and members of the Class to
       adequately protect their sensitive personal information;

    c.  Whether CareCentrix breached its duty to adequately protect the sensitive
       personal information of Plaintiff and members of the Class;

    d.  Whether CareCentrix should have known its data systems and processes were
       vulnerable to attack;

e.  Whether CareCentrix and members of the Class suffered legally cognizable damages as a result of CareCentrix's conduct;

53.    All members of the proposed Class are readily ascertainable by objective criteria. CareCentrix has access to addresses and other contact information for members of the Class, which can be used for providing notice to the Class.

54.    **Typicality.** Plaintiff's claims are typical of the claims of the members of the Class, and Plaintiff will fairly and adequately protect the interests of the Class. Plaintiff and all members of the Class are similarly affected by CareCentrix's wrongful conduct in that their information was exposed to unauthorized users in violation of federal, state and common law.

55.    **Adequacy.** Plaintiff's claims arise out of the same common course of conduct giving rise to the claims of the other members of the Class. Plaintiff's interests are coincident with, and not antagonistic to, those of the other members of the Class. Plaintiff is represented by counsel who are competent and experienced in the prosecution of security breach and class action litigation.

56.    **Predominance of Common Issues of Law and Fact.** The questions of law and fact common to the members of the Class predominate over any questions affecting only individual members, including legal and factual issues relating to liability and damages.

57.    **Superiority of the Class Action Device.** Class action treatment is a superior method for the fair and efficient adjudication of the controversy, in that, among other things, such treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently and without the unnecessary duplication of evidence, effort and expense that numerous individual actions would engender. The benefits of proceeding through the class mechanism, including providing injured persons or

entities with a method for obtaining redress for claims that might not be practicable to pursue individually, substantially outweigh any difficulties that may arise in management of this class action.

58.     **Inconsistent Judgments.** The prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications, establishing incompatible standards of conduct for Defendant.

## CAUSE OF ACTION

### FIRST CLAIM FOR RELIEF
**Negligence**
**(On Behalf of Plaintiff and the Class)**

59.     Plaintiff incorporates all prior paragraphs as though fully set forth herein.

60.     CareCentrix owed a duty to Plaintiff and the Class to exercise reasonable care in obtaining, securing, safeguarding, deleting and protecting Plaintiff and Class members' personal and tax information within its control from being compromised, lost, stolen, accessed and misused by unauthorized persons. This duty includes, among other things, designing, maintaining and testing CareCentrix's security systems to ensure that Plaintiff and Class members' information in CareCentrix's possession was adequately secured and protected and that employees tasked with maintaining such information were adequately trained on cyber-security measures regarding the security of employees' personal and tax information.

61.     CareCentrix owed a duty of care to Plaintiff and members of the Class to provide security, consistent with industry standards, to ensure that its systems and networks, including e-mail traffic and the personnel responsible for navigating the same, adequately protected the personal and tax information of its current and former employees.

62.     CareCentrix owed a duty of care to Plaintiff and members of the Class because they were foreseeable and probable victims of any inadequate security practices.  CareCentrix knew or should have known of the inherent risks in collecting and storing the personal and tax information of Plaintiff and members of the Class, the critical importance of providing adequate security of that information, and that it had inadequate employee cyber-security training and IT security protocols in place to secure that personal and tax information.

63.     Plaintiff and members of the Class entrusted CareCentrix with their personal and tax information on the premise and with the understanding that CareCentrix would safeguard their information, and CareCentrix was in a position to protect against the harm suffered by Plaintiff and members of the Class as a result of the Data Breach.

64.     CareCentrix's own conduct created a foreseeable risk of harm to Plaintiff and members of the Class. CareCentrix knew from prior data security failures as well as the fact that scammers tend to target companies in the healthcare field that CareCentrix was at risk for a data breach. Further, CareCentrix knew that it was a prime target for hackers yet it did not implement adequate and reasonable employee cyber-security training or information transfer protocols and failed to implement adequate and reasonable security procedures and practices aimed at detecting and preventing common e-mail scams.

65.     Through its acts and omissions described herein, CareCentrix unlawfully breached its duty to use reasonable care to protect and secure the personal and tax information of Plaintiff and the Class in CareCentrix's possession and control.

66.     CareCentrix's negligence was a substantial factor in causing harm to Plaintiff and members of the Class. But for CareCentrix's failure to implement and maintain adequate security measures to protect its current and former employees' personal and tax information, the personal

and tax information of Plaintiff and members of the Class would not have been stolen, and they would not have suffered harm or be at a heightened risk of harm in the future.

67.     Neither Plaintiff nor other members of the Class contributed to the Data Breach, nor did they contribute to CareCentrix's use of insufficient security measures to safeguard employees' personal and tax information.

68.     There is a close causal connection between CareCentrix's failure to implement reasonable security measures to protect its current and former employees' personal and tax information and the harm suffered or risk of imminent harm suffered by Plaintiff and members of the Class.

69.     The public policy of preventing future harm supports finding a special relationship between CareCentrix and its employees. It was foreseeable to CareCentrix that collecting large amounts of employee personal and tax information without adequate data security practices and policies would lead to improper disclosure of such information and cause injuries to employees. There is a very close connection between CareCentrix's negligence and the injuries that Plaintiff and the Class suffer. If entities are not held accountable for such negligence, they will not take needed steps to protect the personal and tax information they collect from individuals.

70.     As a direct and proximate cause of CareCentrix's breaches of its duties, Plaintiff and members of the Class have been harmed by the breach of their personal and tax information and have suffered injuries described herein.

71.     Plaintiff and the Class seek compensatory damages and other and further relief as this Court deems just and proper.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, on behalf of herself and the Class set forth herein, respectfully requests the following relief:

a. That the Court certify this case as a class action pursuant to Fed. R. Civ. P. 23(a), (b)(1), (b)(2) and/or (b)(3), and, pursuant to Fed. R. Civ. P. 23(g), appoint the named Plaintiff to be the Class representative and the undersigned counsel to be Class counsel;

b. That the Court award Plaintiff and the Class appropriate relief, including actual damages;

c. That the Court award Plaintiff and the Class pre-judgment and post-judgment interest;

d. That the Court award Plaintiff and the Class attorneys' fees and costs; and

e. That the Court award Plaintiff and the Class such other favorable relief as allowable under law or at equity.

## JURY DEMAND

Plaintiff, on behalf of herself and the Class of all others similarly situated, hereby demands a trial by jury on all issues so triable pursuant to Rule 38 of the Federal Rules of Civil Procedure.

## PLACE OF TRIAL DESIGNATION

Pursuant to Local Rule 40.2, Plaintiff, on behalf of herself and the Class of all others similarly situated, designates Kansas City, Kansas as the place of trial in this matter.

21

Dated: June 2, 2016                    Respectfully submitted,

                                       **STUEVE SIEGEL HANSON LLP**

                                       /s/ Norman E. Siegel
                                       Norman E. Siegel       (D. Kan. No. 70354)
                                       Barrett J. Vahle       (D. Kan. No. 78300)
                                       J. Austin Moore        (D. Kan. No. 78557)
                                       Alexander T. Ricke     (D. Kan. No. 26302)
                                       460 Nichols Road, Suite 200
                                       Kansas City, MO 64112
                                       Tel: (816) 714-7100
                                       Fax: (816) 714-7101
                                       siegel@stuevesiegel.com
                                       vahle@stuevesiegel.com
                                       moore@stuevesiegel.com
                                       ricke@stuevesiegel.com